# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2017-CC-00669-SCT

*GERALD EMMETT BEARD, CHARLES JULES
MICHEL, HAROLD JOSEPH BYRD, NILS
KEREM MUNGAN, GEORGE THATCHER
SHEPARD, JR., MATTHEW DENSON DeSHAZO,
WILLIAM M. ADEN, THOMAS I. RICE, III AND
JOEL G. PAYNE, JR.*

*v.*

*CITY OF RIDGELAND, MISSISSIPPI AND
MAYOR AND BOARD OF ALDERMEN OF THE
CITY OF RIDGELAND*

| | |
|---|---|
| DATE OF JUDGMENT: | 04/21/2017 |
| TRIAL JUDGE: | HON. JOHN HUEY EMFINGER |
| TRIAL COURT ATTORNEYS: | WILLIAM DEMENT DRINKWATER |
| | JERRY L. MILLS |
| | NORMAN ELVIN BAILEY, JR. |
| | JOHN PRESTON SCANLON |
| | SHELDON G. ALSTON |
| | JAMES A. PEDEN, JR. |
| COURT FROM WHICH APPEALED: | MADISON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | WILLIAM DEMENT DRINKWATER |
| | NORMAN ELVIN BAILEY, JR. |
| | SHELDON G. ALSTON |
| ATTORNEYS FOR APPELLEES: | JERRY L. MILLS |
| | JOHN PRESTON SCANLON |
| NATURE OF THE CASE: | CIVIL - REAL PROPERTY |
| DISPOSITION: | REVERSED AND RENDERED - 04/19/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### EN BANC.

### KING, JUSTICE, FOR THE COURT:

¶1.     Shortly after the adoption of its current comprehensive zoning ordinance and map in 2014, the City of Ridgeland ("the City"), on June 2, 2015, adopted an amendment to the zoning ordinance, creating as a permitted use in general commercial ("C-2") districts a Large Master Planned Commercial Development ("LMPCD"). The amendment allowed uses previously prohibited in C-2 districts and created an opportunity for the potential location of a Costco Wholesale ("Costco") off Highland Colony Parkway. Appellants Gerald Emmett Beard, Charles Jules Michel, Harold Joseph Byrd, Nils Kerem Mungan, George Thatcher Shepard Jr., Matthew Denson DeShazo, William M. Aden, Thomas I. Rice III, and Joel G. Payne Jr., residents of the City who live in nearby neighborhoods, appealed the City's decision, arguing that the amendments constitute illegal rezoning and/or spot zoning.

## FACTS AND PROCEDURAL HISTORY

¶2.     In 2009, the City adopted a Comprehensive Plan for land development to serve as a policy guide for the economic development of Ridgeland. General commercial districts were listed as C-2, C-2A, C-3, and C-6 districts. These districts were to include businesses in which the principal activity is conducted indoors. However, it stated that certain land uses that involve some outdoor activities could be permitted in these areas.

¶3.     On February 4, 2014, the City replaced its 2001 comprehensive Zoning Ordinance and Map and adopted its current comprehensive Zoning Ordinance and Map, in which the proposed Costco site was rezoned from a C-4 district to a C-2 district. C-2 districts did not permit gas stations, fast-food drive-through restaurants, drive-through pharmacies, banks, drive-through automatic teller machines (ATMs), food-product carry-out or delivery stores,

2

or laundry and dry-cleaning pickup stations as either permitted or conditional Uses. A C-2

district was defined as follows:

### 410.01 PURPOSE OF THIS DISTRICT:

**A.** The purpose of this district is to promote the development of well-planned shopping centers and independent (free-standing) commercial uses within carefully selected areas of the City of Ridgeland. The commercial activities permitted in this district include uses of a higher intensity than those first allowed in Low-Intensity Commercial districts (C-1).

**B.** It is the intent of this Ordinance that shopping centers and independent commercial uses be developed so that pedestrian and vehicular circulation is coordinated with the circulation patterns of adjacent properties in the vicinity that are also affected. In order to facilitate access between adjoining properties and to reduce the number of curb cuts onto arterial streets, the installation of a service drive shall be considered in connection with any independent commercial use (i.e., a commercial use that is not a part of a shopping center) proposed in this district.

### 410.02 LAND USES PERMITTED:

**A.** All commercial uses allowed in the Low-Intensity Commercial (C-1) District, subject to all C-1 district regulations.

**B.** Business-related retail and service establishments first permitted in Low-Intensity Commercial (C-1) District (no size restrictions).

**C.** Commercial uses in which services performed and merchandise offered for sale are conducted or displayed entirely within enclosed structures, including department stores (full line or discount) and furniture and appliance stores.

**D.** Shopping centers located on minimum sites of three (3) acres on an existing or proposed arterial street as shown on the adopted Thoroughfares Plan; shopping centers may contain any of the uses permitted outright in C-2 zones.

**E.** Strip Center Developments.

**F.** Hotels and motels and related restaurants.

**G.** Broadcast studios (with transmitting towers located elsewhere).

**H.** Commercial healthcare facilities, such as dialysis centers, physical therapy facilities, diagnostic and imaging facilities, 24-hour medical clinics, etc.

**I.** Veterinary clinics and pet shops, excluding outside runs (kennels) subject to Special Use Site Plan Standards in Section 600.14.F.

**J.** Mortuaries, funeral homes, mausoleums, chapels and related facilities subject to Special Use Site Plan Standards in Section 600.14.F.

**K.** Public streets, highways, private streets, and alleys.

**L.** Free standing, enclosed restaurants including fast food and fast casual restaurants with no drive-thru (excluding drive-in restaurants).

**410.03 CONDITIONAL USES AND STRUCTURES AS PROVIDED UNDER SECTION 600.09**

**A.** Townhouses, patio homes, and zero lot line homes subject to the regulations of the R-3 Single Family Residential District, R-4 Zero Lot Line Residential District, and R-4A Townhouse Residential District provided: that the front yard setback for these residential uses when fronting on a principal arterial or minor arterial street (according to the adopted Thoroughfares Plan ); shall be at least 100 feet from the existing or proposed street right-of-way of such arterial streets; or that noise mitigation measures, acceptable to the Mayor and Board of Aldermen (such as berms), be installed by the developers of these residential uses.

**B.** Public or quasi-public facilities and utilities in compliance with Section 32 and other regulations of this Ordinance.

**C.** Other Conditional uses listed under the C-1 Low-Intensity Commercial District regulations.

**D.** Buildings in excess of 48 feet or four stories.

¶4.    The commercial zoning districts progressively increased in commercial intensity. The next commercial zoning district listed was a General Commercial District ("C-2A") (Arterial Streets). The purpose of a C-2A district was to "allow property . . . on arterial streets to have additional permitted uses because of the volume of traffic located in these areas." All commercial uses allowed in C-2 districts also were permitted in C-2A districts, in addition to: food-product carry-out and delivery stores; banks, branch banks, drive-through ATMs, and other banking facilities; laundry and dry-cleaning pickup stations; restricted uses[1]; and public streets, highways, private streets, and alleys. Conditional uses for C-2(A) districts included: fast-food restaurants with drive-through, fast casual restaurants with drive-through, and drive-in restaurants; convenience stores; service stations; convenience grocery stores; pharmacies with a drive-through; other conditional uses listed under the C-2 general

---

[1]Restricted uses were "to be limited to C-2A only and were not permitted to pyramid into any other zoning district."

commercial district regulations; lawn and garden equipment sales and service (excluding outside sales and display); coin-operated laundromats; and public or quasi-public facilities or utilities might be considered as conditional uses subject to the provisions of Section 32 of the ordinance.

¶5.    The next commercial zoning district was a convenience commercial district ("C-3"), whose stated purpose was:

> to establish specific areas for the development of convenience commercial uses. These uses generate heavier vehicular traffic volumes than uses first allowed in the C-2 General Commercial districts. The uses first permitted in this district tend to generate more noise and litter than General Commercial uses. These districts are appropriate for location near the intersections of arterial streets, well away from ANY residential uses.

Permitted uses in C-3 districts included any use permitted outright in C-2A districts, as well as convenience stores; convenience grocery stores; service stations; fast-food restaurants, drive-through restaurants, and drive-in restaurants; photomats; public streets, highways, private streets, and alleys; and pharmacies with drive-through. Conditional uses in C-3 districts included: public or quasi-public facilities or utilities; climate-controlled storage facilities; car washes/vacuum-cleaner stations and quick car-care clinics (lubrication, tune-up, etc.); and free-standing "game rooms," for electronic video games, pool tables, etc.

¶6.    Shortly after the February 2014 adoption of the new comprehensive zoning ordinance, in March 2014, Alan Hart, Director of Community Development for the City, prepared concept plans to send to a Costco representative regarding the possibility of locating a Costco in Ridgeland. In August 2014, the City submitted six potential sites along I-55 for Costco to consider. Costco's consultant determined that the Highland Colony Parkway site most aptly

5

suited its requirements. The proposed Costco site was to be located on a forty-five-acre tract along the east side of Highland Colony Parkway, south of Old Agency Road. Once negotiations began, the City was advised that all discussions must be held in strict confidence.

¶7.     In September 2014, City officials nicknamed the Costco project "Project Santa Claus" in order to keep the venture confidential from the public. At that point, the Board of Aldermen, the city engineer, and the public works director had not been informed of the talks with Costco. Mayor Gene McGee repeatedly stated to the press and public that rumors regarding a Costco locating in Ridgeland were untrue, even subsequent to an article in the Jackson *Clarion-Ledger* stating that Costco had posted job openings for a Ridgeland location.

¶8.     Costco representatives then began the process of acquiring the necessary real estate. On November 5, 2014, Mayor McGee sent an email to Dan Venable, Costco's local real estate agent, stating that Mayor McGee's "staff will bend over backwards to assist [Venable] with all [his] needs."

¶9.     Costco chose Andrew Mattiace, the developer of The Renaissance at Colony Park, to lead the development and acquisition of the Costco project. On November 12, 2014, Hart emailed a Costco representative regarding a meeting held the previous week. Hart stated that the sale of all goods except for the fuel center complied with the City's current zoning regulations. He then wrote, "[w]e also believe that we can appropriately amend the language of the zoning ordinance to accommodate the accessory detached fuel facility. That process

6

would take less than 60 days and could be done in as few as 30 days." The record also includes an email Mattiace sent to Hart on November 19, 2014, requesting that Hart call him because "we have a BIG question regarding zoning."

¶10. On February 27, 2015, at a planning retreat, Mayor McGee first informed the Board of Aldermen that Costco was the anchor tenant being considered and stated that all discussions must be confidential.

¶11. On April 23, 2015, Mattiace's attorney, Mark Davis, sent Hart an email stating that the Purchase and Sale Agreement for the Costco site would require that the seller make representations about the zoning status of the property:

> including the fact that the property can be used for a vehicle fueling facility. Since the Santa site is zoned C-2, the seller cannot make that representation without an exception to explain that the property cannot be used for a vehicle fueling facility. [Mattiace] indicated that the City is proposing an amendment of the zoning code to resolve that matter. To make the exception in the Purchase and Sale Agreement acceptable, the seller will need to provide an explanation about the proposed amendment. A copy of the proposed amendment and a proposed schedule for its adoption would be helpful to keep the proposed transaction moving. . . .

Hart responded with an email stating:

> Yes. I will have something to you by the beginning of next week provided [Mattiace] can offer me some specific parameters of the project, which will assist me in shaping the "draft" ordinance amendment. Information like use types and square footages of each would be a good start. I would also ask for any wisdom regarding anything else that would make this development unique to any other. We also discussed the importance of making the uses "Permitted Uses."

On May 1, 2015, Hart sent Davis an email with the proposed zoning language, stating that Hart would like comments before he sent it to "Santa Claus" for review. Davis responded

7

that he had "made a few tweaks" that he needed to go over with Mattiace.

¶12.    The proposed amendment expanded the definition of "Service Station," adding the sale of propane and other fuels to the term. In addition, it created an LMPCD, which allowed for uses prohibited in C-2 districts. The adopted zoning amendment defined an LMPCD as:

> Any large commercial development consisting of a group of one (1) or more contiguous separately owned or ground leased tracts or parcels that contain, among the group of tracts or parcels, at least one building for occupancy for retail/wholesale purposes exceeding 100,000 square feet of heated and cooled space for the indoor display and sale of goods, a site with a minimum of 15 contiguous acres, access to an Arterial Street, and approved by the Mayor and Board of Aldermen which may or may not include conditions. Large Master Planned Commercial Developments may include any of the uses permitted in the underlying Zoning District as well as Service Stations; Banks, branch banks, drive-thru ATM's, and other banking facilities; Food product and carry-out and delivery stores, laundry and dry cleaning pickup stations; Fast Food Restaurant with drive-thru; Fast Casual Restaurant with drive-thru; Pharmacy with a drive-thru; and outdoor display of goods in designated areas approved by the Mayor and Board of Aldermen in one (1) or more locations not exceeding an aggregate of 15,000 square feet.

¶13.    On May 5, Davis emailed Hart, informing him that he had discussed the proposed amendments with Mattiace. Davis stated that the proposed language for the new service-station definition was acceptable. However, Davis proposed amendments to the language regarding the LMPCD. Two hours after Davis sent the proposed changes, Mayor McGee and the Board of Aldermen held their regularly scheduled public meeting and voted to set a public hearing to consider amending the Official Zoning Ordinance. The City published notice of the hearing in the Madison County *Journal* on May 14, 2015.[2] On June 2, 2015, the City adopted the version of the zoning ordinance that included Mattiace's proposed

---

[2]Davis inquired in the interim whether or not the amendment was on track for adoption.

language.[3]

¶14.   Businesses in the State of Mississippi have the opportunity to qualify for significant tax incentives through the Mississippi Tourism Project Incentive Program. In order to qualify, a development may be considered as a "cultural retail attraction":

> a project which combines destination shopping with cultural or historical interpretive elements specific to Mississippi with a minimum private investment of Fifty Million Dollars ($50,000,000.00) in land, buildings, architecture, engineering, fixtures, equipment, furnishings, amenities and other related soft costs approved by the Mississippi Development Authority and which . . . *is located in a qualified resort area . . . and is a part of a master-planned development.*

Miss. Code Ann. § 57-26-1 (Rev. 2014) (emphasis added). On June 11, 2015, a Mattiace representative emailed Hart, requesting that the City approve the Costco site as a "qualified resort area." The City approved the site as a qualified resort area on June 16, 2015.

¶15.   In July 2015, anti-Costco emails began to be sent to the Board of Aldermen. Mayor McGee and the Board of Aldermen continued to deny that a Costco was coming to Ridgeland.

¶16.   The Appellants herein, residents of subdivisions near the proposed Costco site, filed a Complaint for Declaratory Judgment on November 25, 2015. The Appellants argued that the June 2, 2015, zoning ordinance amendment should be declared invalid because it had been adopted without notice and for the specific purpose of benefitting a favored developer. Instead of litigating the issue further, the City revised and republished its notice and held

---

[3]Mattiace then sent an email requesting "the documentation for the Zoning Variance . . . ." Hart responded, stating "it is not considered a 'zoning variance.' We passed a Zoning Amendment."

another hearing to consider the same subject.

¶17. On February 16, 2016, the City voted to hold a public hearing scheduled for April 5, 2016, to consider the adoption of an ordinance that would repeal the zoning amendments adopted on June 2, 2015, and would replace those amendments with a new amendment of substantially similar language. The City noticed the public hearing on February 25, 2016.

¶18. The new amendment defined LMPCD as:

> Any large commercial development consisting of one (1) or more contiguous parcels that may be individually owned, separately owned, or ground leased tracts or parcels that meets the following criteria, among the group of tracts or parcels: (a) contains at least one building for occupancy for retail/wholesale purposes exceeding 100,000 square feet of heated and cooled space for the indoor display and sale of goods, (b) is a site with a minimum of 15 contiguous acres, and (c) has access to an Arterial Street. Before any land may be defined as a Large Master Planned Commercial Development, a site plan thereof shall be approved by the Mayor and Board of Aldermen. The Mayor and Board of Aldermen may impose conditions or restrictions as part of the approval. Large Master Planned Commercial Developments may include any of the uses permitted in the underlying Zoning District as well as Service Stations; Banks, branch banks, drive-thru ATM's, and other banking facilities; Food product and carry-out and delivery stores, laundry and dry cleaning pickup stations; Fast Food Restaurant with drive-thru; Fast Casual Restaurant with drive-thru; Pharmacy with a drive-thru; and outdoor display of goods in designated areas approved by the Mayor and Board of Aldermen in one (1) or more locations not exceeding an aggregate of 15,000 square feet.

¶19. In the April 5, 2016, meeting, counsel for the City argued that the proposed amendments were general textual amendments to the current zoning ordinance and that the amendments did not constitute a rezoning. However, Alderman D.I. Smith testified that "we were told in February of 2015 for the very first time that Costco was interested in rezoning. . . ." Alderman Ken Heard argued that the zoning amendment language was "tailor made for a very specific project." By a four-three vote, the Board of Aldermen voted to adopt the new

10

amended zoning ordinance.

¶20.    The Appellants appealed the adoption of the April 5, 2016, Ordinance on April 14, 2016, in the Circuit Court of Madison County, arguing that the amendments constituted illegal rezoning or spot-zoning. The City argued that the zoning change was a mere textual amendment.

¶21.    On April 21, 2017, the circuit court affirmed the zoning amendments. Because the applicant's site plan must be approved by the City before any land may be defined as a LMPCD, the trial court found that no rezoning had occurred. The circuit court also found that the amendment could apply equally to seventeen different C-2 districts, not solely to the Costco site. Therefore, the trial court held that the amendment did not constitute a rezoning or spot-zoning.[4]

¶22.    The Appellants raise the following issues:

> a.Whether the April 5, 2016, amendments to the Official Zoning Ordinance of the City of Ridgeland constitute de facto rezoning that required the City to show a substantial change in neighborhood character prior to rezoning.

> b.Whether the April 5, 2016, amendments constitute impermissible spot zoning designed to benefit a single favored developer.

¶23.    The City additionally argues that the Appellants lack standing to challenge the amendments.

**ANALYSIS**

¶24.    This Court will affirm a board's zoning decision unless it is "arbitrary, capricious,

---

[4]The City approved Costco's Site Plan/Architectural Review on June 7, 2016. The Appellants appealed that action but subsequently agreed to dismiss the appeal.

discriminatory, or is illegal or without a substantial evidentiary basis." ***Modak-Truran v. Johnson***, 18 So. 3d 206, 209 (Miss. 2009) (citation omitted). "There is a presumption of validity of a governing body's enactment or amendment of a zoning ordinance and the burden of proof is on the party asserting its invalidity." ***Id.***

## I.  Whether the zoning amendments constitute de facto rezoning that required the City to show a substantial change in neighborhood character prior to rezoning.

¶25.    The Appellants argue that the City's decision to amend the zoning ordinance materially changed the uses previously allowed in C-2 districts and thus can be valid only upon a showing of substantial change in neighborhood character. Amendments to zoning ordinances "must be made after careful consideration because investments in land and property are significant financial decisions, and a landowner should be able to rely upon a zoning plan to maintain the use and value of his property." ***Roundstone Dev., LLC v. City of Natchez***, 105 So. 3d 317, 321 (Miss. 2013) (citation omitted). As this Court previously has stated:

> The courts presume that comprehensive zoning ordinances adopted by municipal authorities are well planned and designed to be permanent. Before property is reclassified from one zone to another, there must be proof either, (1) that there was a mistake in the original zoning or, (2) the character of the neighborhood has changed to such an extent as to justify rezoning and that public need exists for rezoning. Furthermore, an applicant seeking rezoning must prove by clear and convincing evidence either (1) or (2) above.

***Town of Florence v. Sea Lands, Ltd.***, 759 So. 2d 1221, 1224, 1227 (Miss. 2000). "A finding of no sufficient proof will lead this Court to conclude that the Board's decision was arbitrary and capricious." ***Id.*** at 1227.

¶26.    The Appellants first cite as controlling authority ***Modak-Truran***, in which this Court

12

held invalid two zoning ordinance amendments adopted by the Jackson City Council which allowed the Fairview Inn, a bed and breakfast inn located in a residential zone, to operate a restaurant. *Modak-Truran*, 18 So. 3d at 207. This Court found that the amendments effectively rezoned the Fairview Inn from residential to commercial property by allowing the bed and breakfast to operate a restaurant as of right without having to apply for a use permit. *Id.* at 211. Despite the City of Jackson's argument that the amendments did not make any changes to the zoning map and were text amendments, this Court found that the amendments circumvented the "stringent procedural requirements for rezoning." *Id.* at 210-11.

¶27. Similarly, in *Drews v. City of Hattiesburg*, 904 So. 2d 138 (Miss. 2005), Lee Medical Development had purchased land located close to a hospital in Hattiesburg. *Drews*, 904 So. 2d at 140. Although the land had been zoned as B-1, professional business district, Lee Medical requested variances to the zoning ordinance that would have allowed the maximum building size to increase from 10,000 to 60,000 square feet and allowed an increase in building height from thirty-five to forty-five feet. *Id.* Finding that the proposed variances constituted spot-zoning, this Court stated that the City of Hattiesburg had "attempted to bypass the safeguards provided by the rezoning process in that the need for a variance must be proven by only a preponderance of the evidence while the need for rezoning must be proven by clear and convincing evidence." *Id.* at 142.

¶28. The City's zoning ordinance also provides criteria for rezoning. It states:

No amendment to the Official Zoning Map shall be approved unless the proposed re-zoning meets one of the following criteria:

1. That there was a mistake in the original zoning. "Mistake" in this context

13

shall refer to a clerical or administrative error, such as a mistake of draftmanship on the **Official Zoning Map** or incorrectly reflecting the Mayor/Board of Aldermen's decision in the minutes. "Mistake" DOES NOT mean that the Mayor/Board of Aldermen made a mistake in judgment in their prior zoning, such as not realizing the full import of the zoning classification or mistakenly placing the property in one classification when the evidence indicated that another would have been more appropriate.

2. That the character of the neighborhood has changed to such an extent as to justify reclassification, AND that there is a PUBLIC NEED for the re-zoning.

(Emphasis in original.)

¶29. The zoning amendments at issue here allow any site approved as an LMPCD to be allowed uses previously prohibited in C-2 districts but permitted in C-2A districts, such as: banks, branch banks, drive-through ATMS, and other banking facilities; food-product and carry-out and delivery stores; and laundry and dry-cleaning pickup stations. According to the 2014 Zoning Ordinance, C-2A districts are allowed those additional uses because those properties are located on arterial streets and are able to handle the volume of traffic.

¶30. Moreover, service stations, fast-food restaurants with drive-through, and drive-through pharmacies are not permitted uses in C-2 or C-2A districts. Instead, those uses are permitted in C-3 districts. The purpose of C-3 districts is:

[t]o establish *specific areas* for the development of convenience commercial uses. These uses generate *heavier vehicular traffic volumes than uses first allowed in the C-2 General Commercial districts*. The uses first permitted in this district tend to generate more noise and litter than General Commercial uses. *These districts are appropriate for location near the intersections of arterial streets, well away from ANY residential uses*.

Therefore, the 2014 zoning ordinance specifically contemplated uses in C-2 and C-3 districts and rejected allowing those additional permitted uses in C-2 districts because of the increase

in vehicular traffic, noise, and litter associated with those uses. Even according to the City's newly adopted zoning ordinance, the uses allowed in C-3 districts should be located "well away from ANY residential uses."

¶31.    We find no merit in the City's argument that the amendments were purely textual amendments. In context, before the proposed amendments, even a Chick-fil-A with a drive-through had  not been allowed in a C-2 district. Yet the City argues that the addition of a Costco with a service station and drive-through restaurants did not effectively rezone the proposed area. Although the City labeled its actions as mere textual amendments, as this Court in *Modak-Truran* has recognized, "the name given a municipal act does not dictate its nature." *Modak-Truran*, 18 So. 3d at 210. The City cites *Blacklidge v. City of Gulfport*, where the City of Gulfport rezoned a certain area from residential to residential-business. *Blacklidge v. City of Gulfport*, 223 So. 2d 530, 531 (Miss. 1969). However, the City of Gulfport's comprehensive zoning ordinance had been twenty-eight years old and the City of Gulfport had vastly changed since the adoption of the ordinance. *Id.* at 532. In contrast, the City of Ridgeland's comprehensive zoning ordinance had been passed mere months before the City sought to change the zoning districts.

¶32.    The City argues, and the circuit court found probative, that the amendments did not automatically allow a LMPCD but instead hinged on the Mayor's and Board of Aldermen's approval of a site plan. Yet, without the amendments, no opportunity existed to submit a site plan for the additional uses the Costco development required. The amendments effectively rezoned the property by allowing a LMPCD upon approval of the Mayor and Board of

15

Aldermen. The amendment stated that, "before any land may be defined as a Large Master Planned Commercial Development, a site plan thereof shall be approved by the Mayor and Board of Aldermen. The Mayor and Board of Aldermen may impose conditions or restrictions as part of the approval." Therefore, the Mayor and Board of Aldermen had complete authority to approve or disapprove a LMPCD without any objective criteria. The proposition that seventeen additional sites in C-2 districts could be approved as LMPCDs lacks substance when the Mayor and Board of Aldermen have complete authority over whether or not to allow any or all of those sites to become LMPCDs.

¶33.    The City further argues that, pursuant to Mississippi Code Section 21-19-1, a municipality has broad authority to make regulations to promote and preserve the health, safety, and general welfare of its citizens. *See* Miss. Code Ann. § 21-19-1(1) (Rev. 2015). In addition, Section 21-17-5 states that municipal authorities "shall . . . have the power to alter, modify and repeal such orders, resolutions or ordinances." Miss. Code Ann. § 21-17-5(1) (Rev. 2015). Section 17-1-9 provides insight into the purpose of zoning regulations by stating:

> Zoning regulations shall be made in accordance with a comprehensive plan, and designed to lessen congestion in the streets; to secure safety from fire, panic and other dangers; to provide adequate light and air; to prevent the overcrowding of land; to avoid undue concentration of population; to facilitate the adequate provision of transportation, water, sewerage, schools, parks and other public requirements. Such regulations shall be made with reasonable consideration, among other things, to the character of the district and its peculiar suitability for particular uses, and with a view to conserving the value of buildings, and encouraging the most appropriate use of land throughout such municipality.

Miss. Code Ann. § 17-1-9 (Rev. 2012).

16

¶34.   In the 2014 Zoning Ordinance and Map, the Costco site was zoned in a C-2 district in accordance with the above-cited code sections. Because the proposed site is in close proximity to residential neighborhoods, allowing the site effectively to be rezoned to a C-3 district directly goes against the goal of zoning regulations listed in Section 17-1-9: to lessen street congestion and prevent overcrowding of land. Although Section 17-1-15 states that municipal authorities have the power to amend a zoning ordinance "from time to time," again, the City had zoned the Costco site as a C-2 site mere months before the City began attempting to rezone the area again.

¶35.   The City cites *Mississippi Manufactured Housing Association v. Board of Supervisors of Tate County*, 878 So. 2d 180 (Miss. Ct. App. 2004), and argues that the "change or mistake" rule does not apply in this case. However, we do not find that case probative or precedential. In that case, the board of supervisors was attempting to amend its comprehensive zoning plan that had been adopted in 1972. *Id.* at 182-83. Mississippi Manufactured Housing Association (MMHA) argued that a political entity was powerless to amend its entire zoning ordinance and asserted that the board of supervisors was required to show a change or mistake in the original comprehensive zoning plan. *Id.* at 185. The Court of Appeals stated that the clear and convincing rule applied when the amended zoning ordinance altered the character of the community. *Id.* 187. Clearly the amended zoning ordinances here operated to alter the character of the community.

¶36.   The City failed to show by clear and convincing evidence that a mistake in the original zoning occurred or that a change in the character of the neighborhood occurred that justified

17

rezoning, and a public need existed for the rezoning. Because, almost immediately after adopting a new comprehensive zoning ordinance and map in 2014, the City sought to change the zoning of the proposed Costco site to allow numerous prohibited uses, and because those additional uses effectively transformed the proposed Costco site from a C-2 district to a C-3 district, we find that the City illegally rezoned the property at issue.

## II. Whether the April 5, 2016, amendments constitute impermissible spot-zoning designed to benefit a single favored developer.

¶37. The Appellants additionally argue that the zoning amendments constituted spot-zoning. "Spot-zoning" is considered an arbitrary or discriminatory zoning decision and is determined on a case-by-case basis. *Modak-Truran*, 18 So. 3d at 209-10. It is invalid when used primarily for the private interest of the owner of the property and not related to the community as a whole. *Id.* "The term 'spot zoning' is ordinarily used where a zoning ordinance is amended reclassifying one or more tracts or lots for a use prohibited by the original zoning ordinance and out of harmony therewith. . . . The one constant in the cases, as stated by the textwriter, where zoning ordinances have been invalidated due to 'spot zoning' is that they were designed 'to favor' someone." *McKibben v. City of Jackson*, 193 So. 2d 741, 744 (Miss. 1967) (citing Yokley Zoning Law and Practice §§ 8-1 to 8-3 (3rd ed. 1965)).

¶38. The 2014 Zoning Ordinance provided guidelines for amendments to either the zoning ordinance text or the official zoning map, a rezoning. Because the amendments at issue here constituted a rezoning, in order to be upheld they must have passed the following threshold standards for a valid spot-zoning:

18

(a) The proposal must not be a small parcel of land singled out for special and privileged treatment.

(b) The proposed change must be in the public interest and not only for the benefit of a land owner(s).

(c) The proposed change is consistent with all elements of the comprehensive plan and sound planning principles as follows:

1. If a development proposal falls within one of the use and/or residential density categories indicated on the Future Land Use Map, the Zoning Board and the Mayor and Board of Aldermen shall determine if the proposal is consistent with the plan.

2. If a development proposal is not consistent with the Future Land Use Map, the Zoning Board and the Mayor and Board of Aldermen will review the plan's written policies to determine whether the proposal would undermine or conflict with them. If the Mayor and Board of Aldermen determines that the proposal would not conflict with or undermine the plan's policies, they shall find the proposal consistent with the plan.

3. If an applicant's property for re-zoning falls adjacent to a district having the desired zoning classification, the rezoning proposal may be determined to be consistent as an extension of the adjacent property's zoning classification.

(d) The proposed change must not create an isolated district unrelated and incompatible to adjacent districts.

¶39.   Thus, a rezoning will be considered illegal spot-zoning if the proposed amendment is for a small parcel of land singled out for special and privileged treatment. This Court in *Modak-Truran* found that, because the Fairview Inn had been the only business affected by the amendments and because "the entire debate was focused on the Inn and its activities," the amendments had constituted illegal spot-zoning. *Modak-Truran*, 18 So. 3d at 209-10.

¶40.   Here too, the proposed amendments were created and were focused solely on Costco

19

and its activities. City officials worked closely together with Mattiace and with Costco representatives to shape the ordinance to fit Costco's needs specifically. Mattiace's attorney emailed Hart regarding the problem with the Costco site being zoned C-2. He stated: "Since the Santa site is zoned C-2, the seller cannot make that representation without an exception to explain that the property cannot be used for a vehicle fueling facility. [Mattiace] indicated that the City is proposing an amendment to the zoning code to resolve that matter." Hart responded, stating:

> I will have [the proposed amendment] to you by the beginning of next week provided [Mattiace] can offer me some specific parameters of the project, which will assist me in shaping the "draft" ordinance amendment. Information like use types and square footages of each would be a good start. I would also ask for any wisdom regarding anything else that would make this development unique to any other.

Hart also wrote to another Mattiace representative, assuring her that the City could appropriately amend the language of the zoning ordinance to accommodate the accessory detached fuel facility. Hart then emailed Mattiace's attorney the proposed amendments and asked for comments before sending the proposed amendments for Costco's review. Mattiace's attorney even made changes to the definition of LMPCD, which the City adopted. And the amendments created a Large *Master Planned* Commercial Development, which enabled Mattiace to apply for the significant tax incentives through the Mississippi Tourism Project Incentive Program.[5]

¶41.    The City argues that the amendments were consistent with the 2009 Comprehensive

---

[5]Pursuant to the Mississippi Tourism Project Incentive Program, a development may qualify as a "cultural retail attraction" if it "*is located in a qualified resort area . . . and is a part of a master-planned development*." Miss. Code Ann. § 57-26-1 (Rev. 2014).

Plan. The Comprehensive Plan stated that general commercial districts included zoning districts C-2, C-2A, C-3, and C-6. It stated that "these areas should include businesses in which the principal activity is conducted indoors. However, certain land uses that involve some outdoor activities could be permitted in these areas. . . ." In addition, it stated that "convenience commercial uses can be easily absorbed into the C-2 or C-2A zones, rather than a stand-alone zone." Although the comprehensive plan contemplates absorbing C-3 uses into C-2 or C-2A zones, the City chose not to follow the recommendations of the 2009 Comprehensive Plan when it comprehensively rezoned its districts in 2014. Only when Costco chose the site at issue did the City attempt to rezone the proposed location and add C-3 uses into a C-2 zone.

¶42. Because the City engaged in illegal spot-zoning by singling out a parcel of land for special and privileged treatment, we find that the zoning amendments are arbitrary, capricious, and unsupported by substantial evidence.

### III. Whether the Appellants lacked standing to challenge the amendment.

¶43. The City next argues that the Appellants have failed to prove that any of the additional convenience uses were inconvenient to them personally in a way not common to the public generally. This Court previously has stated, "for a plaintiff to establish standing on grounds of experiencing an adverse effect from the conduct of the defendant/appellee, the adverse effect experienced must be different from the adverse effect experienced by the general public." *Hall v. City of Ridgeland*, 37 So. 3d 25, 34 (Miss. 2010). The *Hall* Court reiterated that standing requirements in Mississippi are "quite liberal." *Id.* at 33. There, the residents

of Ridgeland appealed an ordinance issued by the City to allow the construction of the thirteen-story Butler Snow Attorneys building. *Id.* at 27-28. The developers of the building applied for a conditional use permit to build a building exceeding four stories in a C-4 District. Additionally, the developers sought a variance from certain setback requirements. *Id.* at 29-30.

¶44. The Ridgeland Mayor approved an ordinance allowing the conditional use and variance. *Id.* at 30. When residents of Ridgeland challenged the ordinance, the developers argued that the appellants had no standing. *Id.* at 33. The *Hall* Court found that the appellants were property owners in the City of Ridgeland, with property located near the subject property, and that the appellants had alleged that the development would adversely impact them and other residents. *Id.* at 34. Therefore, the appellants had standing to challenge the conditional use permit regarding the building height. *Id.* at 35. However, the Court found that the appellants did not have standing to oppose the variance because it was minor and would not have an adverse effect on the appellants. *Id.*

¶45. As in *Hall*, here, the Appellants are property owners in the City of Ridgeland, whose properties are located near the proposed Costco site. The Complaint stated that the Appellants are residents of the Montrachet, Dinsmor, Canterbury, Windrush, and Greenwood Plantation Subdivisions in Ridgeland. The petition, included in the record and signed by the Appellants, lists most of the Appellants' addresses, and the Madison County land records confirm the addresses of the Appellants.

¶46. Additionally, the Appellants allege that the Costco development would adversely

impact them as well as other Ridgeland residents. Moreover, the Costco development is not a minor variance and would greatly increase traffic, as well as change the aesthetics of the area. Accordingly, the Appellants do have standing to appeal the zoning amendments, and this issue has no merit.

## CONCLUSION

¶47. Because the City of Ridgeland amended its zoning ordinance shortly after adopting a new comprehensive zoning ordinance and map in order to accommodate Costco, substantially changing the uses previously allowed in a C-2 district without showing a substantial change in neighborhood character, the amendments constituted an illegal rezoning. In addition, because the amendments were entirely designed to suit Costco, the amendments constituted illegal spot-zoning as well. Accordingly, the circuit court erred in finding that the Costco amendments were not arbitrary and capricious. We reverse the decision of the circuit court and render judgment for the Appellants in this case.

¶48. **REVERSED AND RENDERED.**

**RANDOLPH AND KITCHENS, P.JJ., MAXWELL, BEAM, CHAMBERLIN AND ISHEE, JJ., CONCUR. WALLER, C.J., AND COLEMAN, J., NOT PARTICIPATING.**