# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-CA-00831-COA

JAMES FEATHER AND BEVERLY FEATHER          APPELLANTS

v.

CITY OF SALTILLO, MISSISSIPPI, GENO          APPELLEES
ENTERPRISES OF BOONEVILLE LLC, DAVID
RILEY AND MELANIE RILEY

| | |
|---|---|
| DATE OF JUDGMENT: | 07/03/2024 |
| TRIAL JUDGE: | HON. KELLY LEE MIMS |
| COURT FROM WHICH APPEALED: | LEE COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANTS: | EDWIN HUGHES PRIEST |
| ATTORNEYS FOR APPELLEES: | CHRISTOPHER G. EVANS |
| | JAK M. SMITH |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | AFFIRMED - 03/31/2026 |
| MOTION FOR REHEARING FILED: | |

EN BANC.

WESTBROOKS, J., FOR THE COURT:

¶1. James and Beverly Feather appeal from the City of Saltillo's approval of a rezoning application by landowner Manny Geno of Geno Enterprises of Booneville LLC. Geno requested the rezoning of approximately 0.73 acres of his real property located at 891 Old Highway 45 (Parcel Number 054P-19-012-01) from R-3 (medium Residential District) to C-2 (Commercial Corridor District). On June 23, 2023, Saltillo's Board of Aldermen held a public hearing and voted to convert the land to a C-2 zone. The Circuit Court of Lee County affirmed the City's decision. On appeal, the Feathers argue that the City's approval did not meet the criteria for rezoning because it lacked sufficient evidence to justify the

rezoning.[1]

## FACTS AND PROCEDURAL HISTORY

¶2.     On May 11, 2023, Geno, who lived in Booneville, filed a written application with the Saltillo Board of Aldermen requesting that his lot at 891 Old Highway 45, Saltillo, in the Westwood Circle, be rezoned from R-3 to C-2. Geno contracted with David and Melanie Riley, as developers, to sell and convert the property to a commercial gym/fitness center called Snap Fitness. On June 23, 2023, the Mayor and the Board of Aldermen of the City of Saltillo held a public hearing. All interested parties were in attendance and had the opportunity to speak to the city council. The development plan, the current zoning map, the City's zoning ordinance, pictures of the subject property, and titles relative to the subject properties were submitted. During the hearing, Brian Grissom, the city manager, was sworn in and presented a general overview of the rezoning request. He explained that although the zoning map indicated that the property was currently zoned as R-3, due to the parcel originally being part of a larger tract of land, a portion of the parcel was also currently zoned as C-2. When the original property line was established, the entire property was classified as R-1 and became R-3 in 2016. However, at some point, the land or zoning map was resurveyed, and the property line was adjusted, leaving a small portion of the land designated as C-2. As a result, the plot of land was zoned as both R-3 and C-2, with the commercial zoning covering an area of approximately twenty feet.

---

[1] R-3 zoning is designated for medium-density residential areas, allowing various types of residential housing. In contrast, C-2 zoning refers to a commercial district, accommodating businesses and offices.

¶3.    Geno had owned the plot of land for ten years, unaware of the zoning complications it would present at the time of purchase. He believed the lot was partially commercial, partially residential. During the hearing, Geno explained that he owned several commercial properties in the area, and although he did not live in the area, he was familiar with Saltillo and had many friends and family there. The property is located in a historic neighborhood behind a shopping center. The lot had been vacant since 2005, when the house on the property was torn down. Geno admitted that the land had been neglected and not properly mowed or maintained during his ownership. He attempted to sell the lot but had never received any inquiries from potential buyers. He also never considered advertising the property for residential use.

¶4.    During his testimony, Geno revealed that he was behind on property taxes and had been unable to sell or develop the property under its current zoning. A few months prior to the hearing, he was approached by the Rileys about a business opportunity to place a fitness center on the land. Geno acknowledged the Board's previous hesitance to rezone properties but believed having the gym on this lot would lead to better upkeep. He explained that although the original property was intended to be residential when he bought it, circumstances in the area had changed. According to his testimony, given its proximity to fast food restaurants and other commercial properties, he felt rezoning made sense. At the time, residents visiting the shopping center parked in the C-2 portion of Geno's lot. Notably, Geno never spoke to the residential neighbors about their thoughts on rezoning the land. Geno's attorney, Jak Smith, contacted the City's public works director, who testified that the existing

city utilities, including water and sewer, could support the proposed development if the property were rezoned.

¶5.    David Riley testified that he and his wife owned a fitness center called Snap Fitness, located in the shopping center adjacent to the east of the lot. The lot is approximately 150 feet from the current location of the gym. Snap Fitness had been a valuable member of the community for nearly twenty years. They wished to relocate from the strip mall due to an expiring lease and to develop a new stand-alone building on the plot of land. Before the rezoning application, they approached Geno about buying his lot to construct a new building. The Rileys stated that they wanted to enhance the area by potentially offering yoga and pre/post-surgery rehabilitation services, which they could not offer in their existing location and were otherwise not available in the City. During the public hearing, David Riley presented a business proposal to the Aldermen, outlining their vision for the new fitness facility and documents related to the proposed building. Riley acknowledged having business relationships and personal relationships with three members on the Board of Aldermen, including the mayor, all of whom were current or past members of his gym.

### A.    The Feathers' Opposition

¶6.    Several residents appeared during the hearing to ask the Board to deny the request due to safety, construction, loss of property value, and traffic concerns. James and Beverly Feather appeared. James testified and highlighted his concern for safety due to a potential increase in heavy traffic during peak times of the day. James lives two doors down from the plot of land and has lived in the neighborhood for over thirty years. He shared that he

4

represented eighty-six percent of the residents in the Westwood Circle Subdivision who were in opposition of the rezoning and brought a petition with forty-two signatures representing the thirty-six affected properties. He shared that he believed the addition of the gym would decrease the value of the homes and bring about more intrusive light and noise and hinder his privacy. James told the City Council that he believed the increase in commercial businesses would lower the value of the surrounding properties and create a precedent for future rezoning in the area. Lastly, James explained that the City had other empty buildings and lots that were zoned C-2 and could be utilized instead.

¶7.    Ed Priest is the attorney for the Feathers and the attorney for the residents of the area who opposed the rezoning. Priest explained that (1) there was no error in the original mapping or zoning of the property, (2) there had been no substantial change in the character of the neighborhood or property since the original comprehensive plan, and (3) there would be a benefit to the residents. Priest expressed his opinion that Geno and the Rileys were supporting "spot zoning," a deviation from the comprehensive plan that unreasonably benefitted one plot of land to the expense of the surrounding plots of land.

### B.    Traffic Concerns

¶8.    Grissom testified that he had served as city manager for a year but had built and zoned for the City since 2007. He explained that he believed the rezoning would benefit the community by making use of the lot. Grissom acknowledged that the area was congested but said that the City had plans to widen the roads; however, there was no infrastructure or funding to do so. During the hearing, Grissom shared a letter concerning the traffic in the

5

area from city engineers dated June 6, 2023. In the letter the engineers explained that the rezoning would not have a significant adverse effect on the local traffic and that moving the gym to the plot of land might benefit the traffic by redirecting some of it from the intersection of Highway 145 and Old Hwy 45. Grissom added that moving the gym would have no effect on the traffic compared to everything else.[2] He continued by stating, "The three hundred houses that are fixing to be built [are] going to have a bigger impact on this road."

¶9.     Grissom also acknowledged that he had not seen the contract between Geno and Riley and that neither he nor the Board had reviewed the comprehensive plan prior to the public hearing. Grissom agreed that there were other alternatives to maintain the empty lot without converting it into a gym. Lastly, he explained that if the lot were to be rezoned, it would remain C-2, even if the gym were to leave. However, Grissom stated that he did not believe that the adjacent homes would be turned into C-2 zones due to the spacing of the street.

###     C.     The Comprehensive Plan

¶10.    The City creates a comprehensive plan for development once every ten years. According to Grissom, the last comprehensive plan was adopted by the Board in 2010. The record contains the City of Saltillo Zoning Ordinance, which was adopted by the Board of Aldermen in 2016, and the "2028 Development Plan for the City of Saltillo," which was adopted in 2010 by the Board of Aldermen. The Zoning Ordinance serves as a guide for the goals and polices of the new development and redevelopment of the City. The document

_____

[2] Grissom testified that traffic is worse in the mornings because of eastbound traffic headed to the school.

outlined the steps residents must take to rezone land and the standards to which the Board of Aldermen must comply.

¶11. The 2028 Development Plan for the City of Saltillo is the current official comprehensive plan. The plan outlines the City's vision of becoming a thriving community that offers the best quality of life in northeast Mississippi, preserves its rich heritage in Lee County, and is well organized as an emerging hub of growth. The vision as outlined in the plan was for the City to "[i]mprove the quality, function, and style of future development." The City plan included data on population growth and characteristics, transportation, internal infrastructure development, and maps and diagnostics for prospective projects.

¶12. Following the public hearing, the City held a special meeting where the mayor and the Board of Aldermen of the City of Saltillo voted to approve Geno's rezoning request with the required three-fifths majority. The Board found that the rezoning and proposed new development and services would benefit the City and surrounding area by enriching the quality of life of its residents, especially the young residents. The Board determined that Geno had met the requirements of Section 4.1.5 of the 2016 City Zoning Ordinance. Section 4.1.5 states:

> A. The Board shall consider each proposed amendment regarding whether to approve or deny each proposed amendment. The recommendation shall be based on the following criteria:
>
> (1) Conformance with the *Comprehensive Plan*;
> (2) City utilities and sewer can accommodate the uses allowable in the requested zoning district;
> (3) The Allowable uses in the requested zone will not adversely affect the character of the area and will not result in a decrease of property values;

7

(4) That the request does not constitute "spot zoning," as described herein.

B. The burden of proof shall be on the applicant to prove that these criteria are satisfied.

¶13.    The Board found clear and convincing evidence to support the rezoning because (1) the proposed rezoning was in conformance with the comprehensive plan to enhance and enrich the lives of community members by serving a public need, (2) the City's utilities could accommodate the proposed rezoning, (3) the rezoning would not adversely affect the character of the area or decrease the property value, and (4) the requested rezoning was not "spot zoning." Further, the Board found that there had been a change to the area since its original zoning of the property and that the property was zoned as C-2 and R-3 by mistake, which needed to be corrected. The City adopted an ordinance rezoning the property and amended the official zoning map of the City of Saltillo.

¶14.    The Feathers appealed the decision to the Circuit Court of Lee County. The court, sitting as an appellate court, upheld the Board's findings that the subject property warranted rezoning due to its mixed classification and that the rezoning would meet the public's need for the proposed services to be provided to the area.

**STANDARD OF REVIEW**

¶15.    "Upon reviewing zoning cases the cause is not tried de novo[;]" rather, "the circuit court acts as an appellate court only." *Thomas v. Bd. of Sup'rs of Panola Cnty.*, 45 So. 3d 1173, 1180 (¶20) (Miss. 2010). "We will reverse the Board's decision only if the record supports that the decision was arbitrary and capricious, illegal, discriminatory, or not

8

supported by substantial evidence." *Jackson County v. Marcellus*, 383 So. 3d 348, 352 (¶16) (Miss. Ct. App. 2024) (quoting *DeSoto County v. Vinson*, 352 So. 3d 1139, 1142 (¶10) (Miss. Ct. App. 2022)). "It is not the role of the judiciary to reweigh the evidence, but rather to verify if substantial evidence exists." *Vinson*, 352 So. 3d at 1142 (¶10) (quoting *Childs v. Hancock Cnty. Bd. of Sup'rs*, 1 So. 3d 855, 861 (¶19) (Miss. 2009)). Thus, when the Board's decision is "fairly debatable," it will not be disturbed on appeal. *Id.*; *see Elliott Land Devs. LLC v. Bd. of Sup'rs of Jackson Cnty.*, 421 So. 3d 1206, 1214 (¶36) (Miss. 2025).

## DISCUSSION

¶16. The Feathers contend that the City Council erred by (1) approving the application for rezoning because there was no mistake in the original zoning to correct, (2) engaging in "spot zoning," and (3) affirming the rezoning despite the insufficiency of evidence. We address issues I and III together.

### I. The City Council did not err by approving the application for rezoning, and sufficient evidence exists to uphold the decision.

¶17. "Before a zoning authority rezones property, the applicant must show by clear and convincing evidence that either (1) 'there was a mistake in the original zoning' or (2) 'the character of the neighborhood has changed to such an extent as to justify rezoning, and a public need exists for rezoning.'" *White v. City of Starkville*, 283 So. 3d 189, 192 (¶6) (Miss. App. 2019) (quoting *Beard v. City of Ridgeland*, 245 So. 3d 380, 388 (¶25) (Miss. 2018)). Our supreme court has held that amendments to zoning ordinances "must be made after careful consideration because investments in land and property are significant financial decisions, and a landowner should be able to rely upon a zoning plan to maintain the use and

9

value of his property." *Beard*, 245 So. 3d at 388 (¶25) (quoting *Roundstone Dev. LLC v. City of Natchez*, 105 So. 3d 317, 321 (¶17) (Miss. 2013)). Further, under Mississippi Code Annotated section 17-1-17, a super majority vote by the City's Board of Aldermen is required to rezone property from residential to commercial if at least twenty percent of the owners of land immediately adjacent to the rear of the property protest. Miss. Code Ann. § 17-1-17 (Rev. 2012).

¶18. The Board determined that the mixed characterization of the lot was a clerical issue that the Board felt needed to be fixed, and correcting a mistake in the zoning classification could be grounds for the proposed rezoning. However, it is unclear whether restoring the property to its original residential zoning would be a sufficient independent basis for affirming the decision. The current rezoning operates to formalize this error by designating the entire lot as commercial, rather than reinstating it to its original zoning (residential). Regardless, sufficient evidence exists to affirm the Board's decision on other grounds based on the significant changes in the character of the neighborhood, which justify the need for rezoning, coupled with a public need for such changes.

¶19. Municipal officials possess the power to rezone because communities grow and change over time. *Woodland Hills Conservation Ass'n Inc. v. City of Jackson*, 443 So. 2d 1173, 1180 (Miss. 1983). In previous rezoning decisions, this Court has acknowledged "that 'it is impossible to articulate or design a particular test for determining what is sufficient evidence to show a material change and a public need to support rezoning.'" *Speyerer v. Bd. of Sup's of Madison Cnty.*, 139 So. 3d 771, 774 (¶14) (Miss. Ct. App. 2014) (quoting

*Madison Citizens Against Rezoning v. Madison Cnty. Bd. of Sup'rs*, 101 So. 3d 711, 714-15 (¶13) (Miss. Ct. App. 2012)). Our supreme court held that a governing board needs a minimum of evidence, such as a map, changes in the area, statistics demonstrating a public need, and other evidence to make an informed judgment. *See Bd. of Aldermen, City of Clinton v. Conerly*, 509 So. 2d 877, 886 (Miss. 1987); *see also Wrigley v. Harris*, 161 So. 3d 1114, 1117 (¶9) (Miss. Ct. App. 2015) (quoting *Town of Florence v. Sea Lands Ltd.*, 759 So. 2d 1221, 1227 (¶22) (Miss. 2000)). As a result, the Board of Aldermen have the responsibility to act upon public interest when evaluating a rezoning application and are encouraged to refer to the knowledge of the community and the area. *Woodland Hills*, 443 So. 2d at 1181.

¶20.    Accordingly, the Board members were "free 'to consider the statements expressed by all the landowners at the hearing, as well as to call upon their own common knowledge and experience in their town'" when deciding Geno's rezoning request application. *Roundstone Dev. LLC*, 105 So. 3d at 322 (¶22) (quoting *Bd. of Aldermen of Bay Springs v. Jenkins*, 423 So. 2d 1323, 1327 (Miss. 1982)). However, "[t]he Mississippi Supreme Court has not hesitated to reverse [a] board of supervisors' decision[]" to rezone when the change in the character of the neighborhood was not substantial. *Cockrell v. Panola Cnty. Bd. of Sup'rs*, 950 So. 2d 1086, 1092 (¶14) (Miss. Ct. App. 2007) (citing *Wright v. Mayor & Comm'rs of Jackson*, 421 So. 2d 1219, 1223 (Miss. 1982); *City of Oxford v. Inman*, 405 So. 2d 111, 112 (Miss. 1981); *Hughes v. Mayor & Comm'rs of Jackson*, 296 So. 2d 689, 691 (Miss. 1974)); *see City of Oxford*, 405 So. 2d at 114 (finding that the applicant failed to demonstrate that

the character of the neighborhood had changed because the evidence of change was "in accordance with original zoning plan"); *but see Marcellus*, 383 So. 3d at 354 (¶28) (reversing the circuit court's order because the board's decision was not arbitrary or capricious after finding the applicant failed to demonstrate a public need to the board).

¶21.  The recent Mississippi Supreme Court case of *Elliott* demonstrates the deference owed to the governing body's decision when the questions regarding the character of the neighborhood and whether a public need existed were fairly debatable. *Elliott Land Devs. LLC*, 421 So. 3d at 1214 (¶33). In *Elliott*, a land developer was ultimately denied its application to rezone an agricultural lot to a residential one. *Id.* at 1208 (¶4). During the appeal process, the county's board of supervisors listened to testimonies from thirteen neighboring property owners who opposed the rezoning. *Id.* at 1214 (¶38). The residents expressed their belief that the neighborhood had not changed substantially enough to justify rezoning the lot. *Id.* They expressed the importance of preserving the rural character of the area and stated that there was no public need to support the rezoning. *Id.* The development company argued that there was a change in the neighborhood and a public need to warrant rezoning by presenting maps, statistics, Google Earth images, and additional information about the septic tank system. *Id.* at (¶37). The court affirmed the board's denial of the rezoning and held that the board's decision was valid because both sides presented substantial evidence supporting the grant or denial of the rezoning, rendering the decision fairly debatable. *Id.* at (¶39).

¶22.  "A zoning case must be decided on all of the circumstances of that particular case."

*Id.* at 1213 (¶28). Further, "[t]he burden of proof on issues of 'rezoning rests on the party asserting the invalidity of the board's actions, while the board's actions" are presumed valid. *Id.* at 1212 (¶28) (quoting *Miss. Dep't of Env't Quality v. Weems*, 653 So. 2d 266, 280-81 (¶23) (Miss. 1995)). In the case sub judice, the Feathers contend that the City's decision was not supported by clear and convincing evidence of a change in the character of the area and public need. Geno argues that the Saltillo Board of Aldermen followed the proper procedural rules when determining whether to rezone the property because the character of the surrounding neighborhood changed and because there was a need for more commercial buildings and services due to the new housing developments. The testimony indicated that a portion of the subject lot is already zoned C-2 and used for parking for the adjacent shopping center, and the lot is in close proximity to a developing area with fast food establishments and other commercial properties. We conclude that the issue of "whether there has been a sufficient change in the character of the neighborhood and whether a public need exists to warrant rezoning are fairly debatable because both sides presented substantial evidence" to support their argument for whether the standard for rezoning has been satisfied. *Id.* at (¶36).

¶23. As in *Elliott*, the Board considered and heard testimony and evidence from both parties, as well as the community, before arriving at its decision. Both parties presented substantial evidence supporting the grant and denial of the zoning application. Geno presented testimony from the City's public works director, who stated that the existing city utilities could support the proposed development. Additionally, a letter from city engineers

13

confirmed that the development would not contribute to existing traffic concerns, and the City's most recent comprehensive plan and zoning ordinance were also presented. Lastly, the Rileys explained that the fitness center would offer services not available to the general public in the area, further aligning with the City's comprehensive plan.

¶24.    In contrast, James presented a petition signed by forty-two residents opposing the rezoning. Several residents voiced their concerns for safety, construction, loss of property value, and traffic problems. Although a majority of the residents opposed the rezoning because they were concerned about the safety of their children, the potential increase in traffic, and the loss of value in their homes, the city engineers and Grissom attested to the house value not being lowered due to the rezoning and did not foresee a significant increase in traffic if the rezoning was approved. Ultimately, the Board found that the proposed rezoning would not adversely affect the character of the City and was in alignment with Rule 4.1.5 of the Zoning Ordinance and the comprehensive plan. Thus, the Board used its discretion to rezone with a three-fifths vote despite the local residents' disapproval. *See* Miss. Code Ann. § 17-1-17 (Rev. 2024).

¶25.    Consistent with *Elliott*, we affirm the Board of Supervisors' approval because our Court will not disturb the Board's decision of a zoning application where the record does not show the decision was "arbitrary and capricious, illegal, discriminatory, or not supported by substantial evidence." *Marcellus*, 383 So. 3d at 352 (¶16). The Board's approval of the rezoning request was fairly debatable because both sides presented substantial evidence; thus, we are not inclined to overturn the Board's decision. Accordingly, we affirm the circuit

14

court's decision.

## II. The rezoning of the property to C-2 did not constitute "spot-zoning."

¶26. The Feathers contend that the rezoning constituted spot-zoning. Geno argues that the decision to rezone the property was not spot-zoning because under the City Zoning Ordinance, the rezoning did not create "a zone for the specific parcel and different from the surrounding properties in the area." Multiple commercial properties reside east of the lot.

¶27. The City of Saltillo Zoning Ordinance defines spot-zoning as a deviation from the Comprehensive Plan that arbitrarily and unreasonably benefits a single parcel of land, often at the expense of those parcels of land around it, by capriciously creating a zone for that specific parcel and different from the surrounding properties in the area. Our caselaw has consistently invalidated zoning ordinances where spot-zoning exists. *Modak-Truran v. Johnson*, 18 So. 3d 206, 209-10 (¶16) (Miss. 2009).

¶28. However, "[t]he mere fact that an area is small and is zoned at the request of a single owner and is of greater benefit to him than to others does not make out a case of spot zoning if there is a public need for it or a compelling reason for it." *Cockrell*, 950 So. 2d at 1097 (¶28); *see Ridgewood Land Co. v. Simmons*, 243 Miss. 236, 252, 137 So. 2d 532, 538 (1962) (holding even if a zoning ordinance or amendment establishes a small area with a different use within the center of a larger zone, it is not considered spot zoning if it is implemented in alignment with a comprehensive zoning plan).

¶29. The Board determined that a public need existed for the rezoning. The 2028 Master Plan illustrated the public need for services to enhance the community and quality of life for

Saltillo residents. The fitness facility would do just that by providing yoga and surgical rehabilitation services. The Board's decision was "fairly debatable," and this Court will not disturb it on appeal. While the Feathers' argument has merit, and the rezoning may provide Geno a benefit, as rezoning typically does benefit one party or another, the Board nevertheless found a public need for rezoning, and on that basis, the decision cannot be considered spot-zoning. Accordingly, we affirm the circuit court's order affirming the Board's decision.

¶30.   **AFFIRMED.**

**BARNES, C.J., McDONALD, LAWRENCE AND LASSITTER ST. PÉ, JJ., CONCUR. EMFINGER, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.  WILSON, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY CARLTON, P.J., McCARTY AND EMFINGER, JJ. WEDDLE, J., NOT PARTICIPATING.**

**WILSON, P.J., DISSENTING:**

¶31.   "Before property is reclassified from one zone to another, there must be proof either, (1) that there was a mistake in the original zoning or, (2) the character of the neighborhood has changed to such an extent as to justify rezoning and that public need exists for rezoning. Furthermore, an applicant seeking rezoning must prove by clear and convincing evidence either (1) or (2) above." *Beard v. City of Ridgeland*, 245 So. 3d 380, 388 (¶25) (Miss. 2018). "Notwithstanding that informality is acceptable in rezoning proceedings, the governing body still must find the necessary criteria for rezoning by clear and convincing evidence, *and that the evidence is contained in the record.*" *Thomas v. Bd. of Supervisors of Panola Cnty.*, 45 So. 3d 1173, 1182 (¶29) (Miss. 2010) (emphasis added) (brackets and quotation marks

omitted). "To support on appeal a reclassification of zones, the record at a minimum should contain a map showing the circumstances of the area, the changes in the neighborhood, statistics showing a public need, and such further matters of proof so that a rational, informed judgment may be formed as to what the governing board considered. When there is no such proof in the record we must conclude there was neither change nor public need." *Bd. of Aldermen, City of Clinton v. Conerly*, 509 So. 2d 877, 886 (Miss. 1987).

¶32.     In the present case, the applicant, Manny Geno, failed to "prove by clear and convincing evidence" either "that there was a mistake in the original zoning" or that "the character of the neighborhood ha[d] changed to such an extent as to justify rezoning." *Beard*, 245 So. 3d at 388 (¶25). First, regarding a "mistake," the testimony of the city manager indicated that in the past, the subject lot and an adjacent lot zoned C-2 had a common owner, and in a subsequent deed, the former common owner "squared up" the subject lot by including a fifteen- to twenty-foot strip of the C-2 lot in the description of the subject lot. However, there is no evidence that the City ever intended to zone the subject lot C-2 or zoned the lot R-3 by *mistake*. There was simply no "mistake in the original zoning." Rather, the lot includes a narrow strip zoned C-2 because of a prior owner's unilateral decision to include a strip from an adjacent lot in the subject lot.[3]

¶33.     Second, there is also no proof, let alone clear and convincing evidence, of any change in the character of the neighborhood that would justify rezoning. *Conerly*, 509 So. 2d at 886.

---

[3] *See Martinson v. City of Jackson*, 215 So. 2d 414, 416 (Miss. 1968) ("[Z]oning [officials] cannot be presumed to have made a mistake; the presumption is to the contrary"—the original zoning carries a "presumption of correctness.").

17

The separate appellate briefs filed by Geno and the City make the same argument on this issue, asserting as follows:

> The Board of Aldermen also found that the subject property should be re-zoned to C-2 based upon the fact that changes in the character of the neighborhood had occurred since the original zoning to such an extent so as to justify re-zoning and that a public need existed for rezoning. Specifically, Alderman Scottie Clark cited a recent survey study compiled by the Saltillo Main Street Association which indicated that the average age of city residents for Saltillo was actually decreasing to a younger age, rather than increasing over time. Both Alderman Clark and Sonya Witcher indicated that they believed that a new full-service gym/fitness center would be a benefit to the citizenry and that there was a public need for such. Developer Melanie Riley stated that, if the subject property was re-zoned, the proposed new gym/fitness center would enhance the lives of the citizens and nearby residents by providing new services, not otherwise available in the city, such as a yoga studio and pre-surgery and post-surgery rehabilitation. This is also in harmony with the future land use goals, as provided in the city's 2028 Development Plan (comprehensive plan), which calls for creative patterns of development that encourage stronger community functions <u>and are more supportive of healthy human lifestyle</u>.

(Emphasis by the appellees) (footnotes omitted).

¶34.    None of these assertions has anything to do with any change in the character of the neighborhood. The Mississippi Supreme Court has observed that

> *if there has been a change in the neighborhood and if there is a public need therefor, evidence to support it should not be difficult to produce.* To support on appeal a reclassification of zones, the record at a minimum should contain a map showing the circumstances of the area, the changes in the neighborhood, statistics showing a public need, and such further matters of proof so that a rational, informed judgment may be formed as to what the governing board considered. *When there is no such proof in the record we must conclude there was neither change nor public need.*

*Conerly*, 509 So. 2d at 886 (emphasis added).

¶35.    In this case, there is no evidence of any change in the subject neighborhood. There

are no maps in the record showing the circumstances in the area or how, if at all, they have changed over time. Nor was there any specific testimony about any changes to the neighborhood. The subject lot is bordered on three sides by homes in an adjacent residential subdivision, and multiple residents of the subdivision testified that the character of their neighborhood had not changed and that they desired to preserve its residential character. Eighty-six percent of the residents of the subdivision signed a petition opposing the rezoning application. Moreover, the city manager testified as follows:

Q. So it would be fair to say as you sit here today, . . . that you cannot introduce any information, any testimony whatsoever as to change in character of this neighborhood, can you?

A. No, sir.

¶36. Because there is "no . . . proof in the record" of any material change in the character of the neighborhood,[4] there was no basis for the City to rezone the subject lot, and this Court should reverse and render the decisions of the circuit court and the Board of Aldermen.

---

[4] The subject lot is currently vacant (a prior owner having demolished a house on the property), and Geno admitted that he had not kept it mowed or cleaned consistently. Geno testified that he had not "been approached by anyone that was interested in building a house" on the lot. However, Geno also testified that he had "[j]ust recently listed [the property for sale] within the last 12 months" and that he "ha[d] not pursued" selling it as a residential property because he, personally, "felt like the intended purpose of that location was for commercial." Therefore, Geno "couldn't answer [the] question" whether anyone would want to build a house on the subject lot. In any event, none of these facts show any change in the character of the surrounding neighborhood. *See Underwood v. City of Jackson*, 300 So. 2d 442, 443-44 (Miss. 1974) (holding that an applicant "completely failed" to show a change in the character of the neighborhood despite his testimony that "the only way he could sell his property was to have it zoned commercial" and a professional appraiser's opinion that "the highest and best use of the subject property was commercial"); *Patterson v. City of Jackson*, 285 So. 2d 466, 467 (Miss. 1973) (holding that evidence that a vacant lot had not been mowed regularly or "tidily kept" did not show a change in the character of the neighborhood or "warrant rezoning").

19

*Conerly*, 509 So. 2d at 886.  Accordingly, I respectfully dissent.

**CARLTON, P.J., McCARTY AND EMFINGER, JJ., JOIN THIS OPINION.**